## The Pittsburg Coal Co. *versus* Foster *et al.*

59 365
168 133

59 365
26 SC ²332

1. The plaintiff contracted to furnish the defendant on the 1st of February, an engine to draw coal-cars on a track of unusual width; the engine was not delivered till May; the defendant gave evidence that an engine for such track could not be hired, and that he had to transport his coal by horses. *Held*, that evidence of the difference of cost of transportation between horse-power and by the engine during the delay on the part of the defendant, was admissible on the question of damages.

2. Damages ordinarily recoverable are those necessarily following the breach which the defaulting party must be presumed to know would be the consequence of his failure.

3. Evidence that the defendants could have moved and hauled more coal with the engine than with horses, to show the profits from the increase, was inadmissible, being too remote.

4. The rule as to damages in Adams Express Co. *v.* Egbert, 12 Casey 364, approved and adopted.

5. A witness cannot purge himself of interest by his own *voir dire.*

6. That a book was the transfer-book of a corporation could not be proved by inspection of the book. Corporation books do not prove themselves.

November 4th 1868. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., absent.

Error to the District Court of *Allegheny county :* No. 40, to October and November Term 1868.

This was an action of assumpsit by Alexander W. Foster and another, trading as Foster & Co., against The Pittsburg Coal Company. The writ was issued July 21st 1866.

The action was founded on the following agreement :—

"Pittsburg, October 24th 1865.

"To James M. Bailey, President of Pittsburg Coal Company.

"We agree to build a locomotive engine (not exceeding 6 feet in width or height, including stack), to fit a 40 inch track. * * The whole to be of the best material, and built in a workmanlike manner, and finished by the 1st day of February next, and put in thorough running order on your track on or before that day. * * Our price is five thousand five hundred dollars ; one thousand five hundred to be paid us on the 16th day of January next, and the balance when engine is completed and running on your road.

"FOSTER & CO.

"I agree to the above.

"JAMES M. BAILEY,
"President Pittsburg Coal Co."

[Pittsburg Coal Co. *v.* Foster.]

The statement of plaintiffs' claim included some extra work, and amounted to $5596.31, with a credit of $1500 cash paid them; making the balance due, $4096.31.

The plaintiffs gave in evidence the foregoing agreement, the delivery of the engine, &c., and rested.

The defendants called James M. Bailey. He was objected to as interested. The court rejected the witness because, being president of the company, he is presumed to be a stockholder, and primâ facie interested. The defendants then proposed to examine Mr. Bailey on his *voir dire* as to his interest. He was again objected to on the ground that it could not be shown by the witness that his interest had ceased. The court rejected the witness for the reason stated. The defendants offered the transfer book of the company, without proof that the book was what it purported to be. On objection it was rejected for the reason that the court could not determine its character by inspection. The defendants next offered the deposition of P. F. Geisse, in which the witness testified that in September or October 1865 he proposed by letter to build a locomotive engine for Mr. Bailey in four months; the letter did not contain the details, it merely proposed the price, $4200. Mr. Bailey wanted it in three months, and declined the proposition for that reason, &c. The object of the deposition was not stated in the offer, and was rejected. Several bills of exception were sealed by the court to the rejection of the foregoing offers. The defendants then proved that the engine was brought on to the road in the latter part of April, and that up to that time they had hauled coal with horses and mules. They also gave evidence that locomotive engines are not kept on hand for sale; that the track was of an unusual width; with other evidence tending to show that an engine to run on such a track could not be procured by hiring; also evidence of the value per day for the hire of an engine costing $5500; and other evidence bearing on the question of the damage sustained because of the non-delivery of the engine at the time stipulated in the contract.

The defendants then proposed to prove " the amount or quantity of coal transported over defendants' road, from the 1st of February until the time that the engine built by the plaintiffs was put in running order on the road, and the cost and expense of transporting the same by means of horses and mules, and what would have been the cost and expense of transporting the same by means of the engine, if the same had been completed and put in running order on the 1st of February, the time stipulated in the contract—for the purpose of showing the damages actually sustained by the defendants, by the failure of the plaintiffs to complete and deliver the engine in running order on defendants' road at the time provided in the contract—the defendants claim-

ing that the difference in the cost and expense of the two modes of transportation is the measure of damages in this case; the defendants having already shown that engines are not kept on hand for sale, but are built and furnished by contract. And the defendants offer to show, in connection with their offer, that there was no other possible mode of transporting coal over the said road except by means of horses and mules, and by steam-engines, and that at the time of making the contract the defendants transported the same by means of horses and mules."

The offer was objected to and overruled, and a bill of exceptions sealed.

They then proposed to prove "the facts contained in the preceding offer, and in connection therewith, that by the use of the engine the defendants could have mined, hauled and sold a much larger quantity, to wit, one-third more coal than they could by the other means of hauling in their power, and the profits that would have resulted to the defendants therefrom."

The offer was overruled, and a bill of exceptions sealed.

The plaintiffs asked the court to charge the jury:—

2. The measure of damages for the delay is the ordinary hire for such a locomotive during the period of such delay, credited with a reasonable percentage on such hire for the wear and tear of such a locomotive.

The court (Williams, A. J.) answered:—"2. The court has already ruled in answer to the defendants' offer of evidence, that the measure of damages for the plaintiffs' failure to complete and deliver the locomotive in good working order, at the time mentioned in the contract, is not the difference in the cost of transporting the coal actually mined by them, or which might have been mined, during the period of the delay, by means of horses and mules, and the cost of transporting the same by means of the locomotive, if it had been delivered in good working order, according to the contract, but that the measure of damage is the actual or probable cost of the hire of such a locomotive, for the period of such delay. We think this is the true rule or measure of damages. And accordingly [we allowed the defendant to call, as witnesses, men engaged in railroad transportation—familiar with the cost of engines and the price of their hire—to testify as to the per diem value of the use or hire of such an engine as the one in controversy. One of the witnesses estimates the sum of $20 per day to be a fair price for the hire of such an engine. The other says that $10 per day would be a fair price for the use or hire of such an engine. It will be seen that these witnesses differ very widely in their estimates. Their opinions, if not mere conjectures, must be founded on a different basis. While their opinions are evidence, they are not the only evidence in the case.

[Pittsburg Coal Co. *v.* Foster.]

The jury have the evidence as to the price or cost of the locomotive, viz., $5500.

"Then they have the testimony of the witness that such an engine, by careful and proper use, will last twenty years. And it will be for the jury to determine whether the hire of an engine, costing only $5500, and which, if kept in the proper repair, will last twenty years, is worth $20 per day, as estimated by one of the witnesses; allowing three hundred working days in the year, this would make $6000 for the hire for one year, a sum which would more than equal the cost of the locomotive and the interest thereon for a year.

"And then, after having more than paid for itself in the first year, it would be earning the same amount for nineteen years longer, supposing that it would last as long as the defendants' evidence shows that it would. If the jury, then, should find that $20 per day was too high an estimate, is $10 a reasonable sum? At this rate the engine would more than pay for itself, including interest on the price, in two years, and in twenty years would pay more than ten times the price or value thereof. It seems to me that the estimates of both the witnesses are too high; but this is a question for the jury, and they will allow such an amount as they may think right and proper, under all the evidence. .

"Undoubtedly the defendants are entitled to some damages for the delay; such damages as would be reasonable and proper for the delay, unless it was waived by the defendants, and the burthen of establishing such waiver, as we have already instructed the jury, is on the plaintiffs. If the delay was not waived by the defendants, the jury will allow as damages therefor, such an amount as they may deem reasonable and fair for the use or hire of such a locomotive, during the time of the delay, and deduct it from the price of the engine or locomotive."]

The verdict was for the plaintiffs, for $3875.

The defendants took out a writ of error. They assigned for error, the rejection of their offers of evidence and the portion of the charge quoted.

*J. H. Bailey,* for plaintiffs in error.—There was nothing speculative as to the loss incurred in transporting the coal—it was loss actually sustained: Sedgwick on Measure of Damages 61, 73, 76; Hadley *v.* Baxendale, 26 Eng. L. and Eq. 398; Masterton *v.* Mayor of Brooklyn, 7 Hill 62; Fox *v.* Harding, 7 Cush. 516; Fletcher *v.* Taylor, 12 C. B. 21; Adams Express Co. *v.* Egbert, 12 Casey 364; Morgan *v.* Negley, 3 P. F. Smith 153.

*C. B. M. Smith,* for defendants in error.—As to damages cited, Hadley *v.* Baxendale, Adams Express Co. *v.* Egbert, Morgan *v.* Negley, *supra;* Thompson *v.* Shatrick, 2 Metc. 615;

[Pittsburg Coal Co. v. Foster.]

Thompson v. Foord, 1 Ellis & Ellis 602; Taylor v. Maguire, 12 Mo. 313; Brown v. Foster, 1 P. F. Smith 165.

The opinion of the court was delivered, January 4th 1869, by

AGNEW, J.—The only question we need discuss in this case is that relating to the measure of damages. The defendants below offered in substance to prove the difference in the expense of transporting the coal carried on their railroad, between horse or mule power and steam-power, and for this purpose, to prove how much coal was actually carried over their railroad between the 1st day of February—the time for the delivery of the engine under the contract—and the day when the engine was actually put in running order on the road; claiming that this difference of expense was a loss directly occasioned by the failure to finish and deliver the engine in time.

The learned judge overruled this offer, being of opinion that the measure of damages for the delay was the ordinary hire of a locomotive during the period of the delay. We think that under the circumstances of the case, this was an error. It was in proof, and was also a part of the offer, that the only means the defendants had of transporting their coal was by horses and mules, and it also appeared in the evidence that, owing to the gauge of the railroad track and the kind of engine required for their use, it was impossible to have procured for hire an engine to suit their purpose, and that the hire of such an engine was purely a speculative and not a practical question, owing to the fact that the witnesses knew of none such to be had.

The true inquiry which arose under these circumstances, was whether the damages thus claimed were the necessary consequence of the failure to perform the contract in time, and whether they were presumptively within the view of the plaintiffs at the time of making their contract to finish and deliver the engine in running order on the defendants' track by the 1st of February. The damages ordinarily recoverable are those necessarily following the breach, which the party guilty of the breach must be presumed to know would be the probable consequence of his failure: 2 Greenl. Ev. § 253. This rule is well expressed by Strong, J., in Adams Express Co. v. Egbert, 12 Casey 364. They must be a proximate consequence of the breach, not merely remote or possible. There is no measure for losses of the latter kind. "But, on the other hand," he remarks, "the loss of profits or advantages, which must have resulted from a fulfilment of the contract, may be compensated in damages, when they are the direct and immediate fruits of the contract, and must therefore have been stipulated for, and have been in the contemplation of the parties when it was made."

This statement of the rule is quoted with approbation by Thomp-

9 P. F. SMITH—24

son, J., in Fassler *v.* Love, 12 Wright 410–11. The subject is also discussed at large by myself in Fleming *v.* Beck, same volume, 312–13, and the same rule in substance quoted from Hadley *v.* Baxendale, 26 Eng. L. and Eq. 398.

That the loss in this case was immediate and the necessary consequence of non-fulfilment, is obvious. The coal company was by the contract to have a finished locomotive adapted to their railroad put in thorough running order upon their track by the 1st day of February. The direct consequence of not getting it was, that they were obliged to continue transporting their coal as before, by horses and mules, until the engine was put there. It is quite as clear, also, that this consequence must have been in full view of Foster & Co. when they entered into the contract. The instrument evidencing the agreement was a proposition of Foster & Co., accepted by the president of the coal company. It was directed to James M. Bailey, president of the Pittsburg Coal Company, and proposed to build a locomotive engine to fit a forty-inch track. It was to be built in a workmanlike manner, of the best material, and finished by the 1st day of February then next, and "put in thorough running order on your track on or before that day."

The price, $5500, was to be paid, to wit: $1500 on the 16th day of January, "and the balance when the engine is completed and running on your road." Thus the proposition to build the engine shows very clearly that Foster & Co. knew that it was to be used in running on a coal railroad and upon a track of unusual gauge, and the proof shows that at the time of the making of the contract, engines of the size and character of the one described in the proposition were not in ordinary use and could not be hired. From the nature of the circumstances, Foster & Co., as engine-builders, must have known that if they failed to deliver the engine on the track by the day agreed upon, the coal company would be forced to continue transporting their coal by their former means, and consequently would suffer a loss in the difference of expense of transportation between the old mode and the one stipulated for in the contract.

To this extent, therefore, we think the court below erred in rejecting the testimony. But the superadded offer, when the proposition was renewed, to prove that the defendants could have mined and hauled one-third more coal with the engine than by the old mode and to show the profits arising thence, was rightly rejected by the court.

While it is obvious that Foster & Co. must have known that their failure would compel the company to continue in the use of their old mode of transportation, it cannot be fairly inferred that they would know that the possession of the engine would enable the company to mine more coal and also to haul more. This is a

[Pittsburg Coal Co. *v.* Foster.

possible or remote consequence, but not a necessary one. For aught Foster & Co. could know, the defendants were mining to the extent of their ability to operate in the mines; and even could they mine more, it does not follow they must know that the engine would haul more in the same time than the company could do with their horses and mules. The principles governing this offer are stated pretty fully in Fleming *v.* Beck, 12 Wright 312–13.

The reversal of the judgment renders the rejection of James M. Bailey as a witness unimportant, for on the next trial the charter can be given in evidence showing that the president of the company must be a stockholder, and if he be offered it must be shown that he has since transferred his stock.

Presuming Bailey to have been interested, it was clearly right to reject his oath as a means of divesting himself of his interest. An interested witness cannot be offered to purge himself of his interest by his own *voire dire*. The refusal to receive the transfer-book without evidence of its true character being given, was also right. Corporation books do not prove themselves.

The rejection of Geisse's deposition was also right. At the time of offering it no competent purpose was stated as the ground for its reception, and so far as the court could discover upon its face, it did not seem to be relevant to any such purpose. It is the duty of a party to state the purpose of his offer, if the evidence is not obviously competent on its face. A court is not bound to search for some distant relevancy that may exist, but which cannot readily be discerned without the attention of the court being directed to it.

But for the error as to the true measure of the damages, the judgment must be reversed.

Judgment reversed, and a *venire facias de novo* awarded.