# Donnan *v.* Pennsylvania Torpedo Company, Appellant.

*Negligence—Oil well—Torpedo explosion—Damages—Evidence.*

Where a torpedo company undertakes to discharge a torpedo in oil sand some distance below the bottom of an oil well it is bound to bring to the performance of the work the exercise of the ordinary skill and care of the business and avail itself of the usual appliances to guard against injury to the property with which it deals. If the agent of the company fails to use the proper appliances and does not observe ordinary skill, and the torpedo is exploded in the well itself far above the point where the explosion was intended to occur, the company will be liable for the destruction of the well.

In such a case the court commits no error in charging on the measure of damages as follows: " If the damage could be repaired, then the measure of damages would be the cost of that repair. But if the cost of the repair would be more than the value of the property, or if a new well could be drilled more cheaply than this one could be repaired or cleaned out, then of course the party should not estimate his damages by the more expensive method; he should take that which is cheapest. If it is cheaper to drill a new well he should do that. If it is cheaper to abandon the well altogether then he should abandon it, and then would be entitled to charge the party only with the market price, what it was worth in the market. If it was utterly destroyed, or destroyed so that a repair would cost more than the digging of a new well and the digging of a new well would cost more than it would be worth, then neither of these things should be done, and it would come back to the question of the value of the well."

In such a case the jury may properly take into consideration, in estimating the damages, that the well in question was run as one of a system of small wells, and also that the usual and ordinary result of shooting wells in that particular field, which had never been shot before, was to increase the production, and that this quality increased the market value of such wells.

Argued May 4, 1904.    Appeal, No. 96, April T., 1904, by defendant, from judgment of C. P. No. 3, Allegheny Co., May T., 1902, No. 49, on verdict for plaintiff in case of John W. Donnan et al. v. Pennsylvania. Torpedo Company.    Before RICE, P. J., BEAVER, ORLADY, SMITH, PORTER, MORRISON and HENDERSON, JJ.    Affirmed.

Trespass to recover damages for the destruction of an oil well by the explosion of a torpedo.    Before McCLUNG, J.

The facts appear by the opinion of the Superior Court.

When Joseph W. Hamilton, a witness for plaintiff, was on the stand, he was asked this question:

Q. As a general result of shooting in that field, were the wells improved in their production?

Objected to as incompetent and irrelevant.

The Court: With a view to leading up to the question of market value, we will allow that question.

Objection overruled.

To which ruling counsel for defendant request an exception.

Exception allowed and bill sealed. [1]

Question read.

A. Yes sir, greatly.

F. M. Rodgers was questioned as follows:

Q. What was the value of this well, taking into consideration the operation of this well in conjunction with the other wells of this company?

Objected to as incompetent and irrelevant and as not the proper measure of damages.

Objection overruled and bill sealed. [2]

A. Well, from what I have heard here in the testimony, I would think that well ought to be worth three or four thousand dollars, if I owned the other wells there and it would not cost scarcely any more to pump it, and from what shooting I have done in that field, I am satisfied if the well was doing three

quarters of a barrel at that time, it probably might have made a five-barrel well. On the other hand, the well would not be worth very much if he only had just the one well. If we were just considering the one well, it would not justify me at all hardly then.

The court charged in part as follows:

[But if you find these propositions both in favor of the plaintiffs, then the defendant would be liable for damages, and you come to that question. In this case the ordinary rule does not very well apply, or rather, is not very easily applied. Of course, if the damage could be repaired, then the measure of damages would be the cost of that repair. But if the cost of the repair would be more than the value of the property, or if a new well could be drilled more cheaply than this one could be repaired or cleaned out, then of course the party should not estimate his damages by the more expensive method; he should take that which is the cheapest. If it is cheaper to drill a new well, he should do that. If it is cheaper to abandon the well altogether then he should abandon it, and would then be entitled to charge the party only with the market price—what it was worth in the market. So that if you choose between these different methods, you will take the cheapest one; and perhaps it is pretty evident to you, under the testimony, that the cheapest one is the value of the well. If it was utterly destroyed, or destroyed so that the repair would cost more than the digging of a new well and the digging of a new well would cost more than it would be worth, then neither of those things should be done, and it would come back to the question of the value of the well. The ordinary value would be the market value at that time. But, however, it is conceded that a small well like this could not be sold by itself; that is, if you impose upon it the entire cost of operating it, it would have no value at all. It does not follow from this, however, that it can be negligently destroyed and the party not be responsible for anything to the one who owns it. If it has a value as a part of a system, then that is the value upon which you should estimate the damages here. It is said that there are perhaps from half dozen to a dozen wells here that are operated together, and that thus the expense is divided up between them, and that while no one would be worth anything to operate by itself, perhaps, that

taken all together they are valuable, and that practically the market value of this well, if it has one, would be the amount that it diminished the value of this entire system by being destroyed.] [3]

[Now, in determining that, you are not bound to take it just as it was.   It might not have been producing anything at all and yet have had a value.   If it was likely to produce with the expenditure of a small amount of money on it, as for instance by torpedoing it, then it might well have a value.   But it is only the market value; it is only the value of that hole in the ground with the chance that it will produce by the expenditure of a small amount of money.   Of course, you cannot speculate as to damages, and yet these chances have a value.   When a man gets the privilege of drilling an oil well, he has only a chance of getting oil, and an oil well that may be down a thousand or fifteen hundred feet may be worth nothing unless he gets oil, and there is nothing but the chance, and yet a party in a reasonably good oil region would pay something for the work that has been done and taking into account the chance that there is of getting oil there. And in this case if there was a chance that the torpedoing of this well, that is, a reasonable prospect, I mean, by a chance,—if there was a reasonable prospect that oil would be obtained, that would probably give it some value.   You could not, however, estimate that value upon the assumption that the best chance was to happen; and that would seem to me to be the way that some of the witnesses here estimated the value of this well. They assumed that a certain amount would be produced when it was torpedoed, and that is probably the highest amount that they hoped for.   Now, that would not fix the value of it; because it might not be increased at all, and it would not do to estimate it upon the assumption that that highest amount would be produced.   You, I think, catch the idea, that you are simply buying the prospect of getting oil by the torpedoing there, and that is the only thing that adds to the actual production at the time.   This consideration would probably reduce, and possibly reduce very considerably, the estimates that have been made here, because, so far as the witnesses testified, I understood them to be estimating upon the assumption that what they thought might be produced by torpedoing would actually be produced, and that then the well would be worth that much.

At the time this well was destroyed no one knew how much the increase would be, and there was nothing but the chance or prospect of the increase to add to the value indicated then by the existing production.] [4]

Defendant presented this point:

Counsel for defendant respectfully ask the court to charge the jury that under all the evidence in the cause their verdict should be for defendant. *Answer:* Refused. [5]

Verdict and judgment for plaintiff for $1,000. Defendant appealed.

*Errors assigned* were (1, 2) rulings one vidence, quoting the bill of exceptions ; (3, 5) above instructions, quoting them.

*William E. Schoyer*, with him *Schoyer & Hunter*, for appellant.—The court allowed the jury to determine whether the shooter was negligent or not in not ascertaining from his reel whether or not the torpedo was at the bottom. In this we submit there was error : Philadelphia & Reading R. R. Co. v. Hummell, 44 Pa. 375 ; Zahniser v. Penna. Torpedo Co., 190 Pa. 350.

The court below charged the jury that this well had value because it was run as one of a system of wells and that the jury should take this fact into consideration in estimating the damages. In so charging we think the court erred.

The damages in this action are to be determined as if the suit had been brought for breach of the contract ; and in a suit on the contract the plaintiff will be limited to such damages as were in the contemplation of the parties at the time the contract was entered into : Webster v. Woolford, 81 Md. 329 (32 Atl. Repr. 319) ; Hadley v. Baxendale, 9 Ex. 341 ; Fleming v. Beck, 48 Pa. 309 ; Fergusson v. Telegraph Co., 178 Pa. 377.

The court below erred in charging that the chance of increased production as the result of a shot should be taken into consideration in estimating damages : Blagden v. Thompson, 23 Oreg. 239 (31 Pac. Repr. 647).

*A. C. Spindler*, of *Spindler & Kiernan*, for appellee.—Whenever there is a conflict of testimony, or, for any cause, there is

a reasonable doubt as to the facts, or as to the inferences to be drawn from them, negligence.is always a question for the jury: Graham v. Phila., 19 Pa. Superior Ct. 292 ; Howett v. Phila., Wil. & Balt. R. R. Co., 166 Pa. 607.

OPINION BY PORTER, J., October 17, 1904 :

The plaintiffs were owners of a well which for a number of years had been producing oil; they determined to attempt to increase the production and made a contract with the defendant company to discharge a torpedo in the oil sand at a distance of twenty-seven feet from the bottom of the well, which was 1,858 feet deep. The defendant company sent one of its employees who fired a shot in the well, which resulted in its total destruction. The fact that the well was ruined by the discharging of the torpedo would not, of itself, entitle the plaintiff to recover, but that is not this case. The fact that the well was 1,858 feet deep and that the defendants had been instructed to fire the torpedo at the distance of twenty-seven feet from the bottom was not disputed. The well was cased for a distance of 1,700 feet or about 150 feet from the bottom. The plaintiffs called two witnesses who testified that when the shot was fired the casing in the well jumped up two feet and remained there, settling back about six inches during the night, and there was other evidence in the case which if believed clearly established that this could only have resulted from a shot fired in the casing, and over 100 feet above the point where the torpedo ought to have been discharged. When the casing was drawn from the well it was found that it had been shot entirely off at a depth of 1,035 feet, and the remainder of the casing, over 600 feet, remained in the well, from which it could not be removed. The well was completely obstructed at the depth of 1,035 feet, could not be cleaned out and was useless. The section of the casing which had been in the well at a depth of 1,035 feet was offered in evidence, and the testimony of expert witnesses as to what could have produced the condition, in which it then was, was conflicting, but there was evidence which would have justified a finding that this condition could only have been produced by a shot fired at that particular point. The court could not, under the evidence, determine as matter of law that the plaintiffs had not satisfactorily established the fact that the

shot had been fired in the casing, at the depth of 1,035 feet, and that a shot fired at that point necessarily meant the destruction of the well.   The operation was, what is known as a line shot, the torpedo being suspended by a wire, the purpose being to hold it in the position at which it was intended to be discharged. There was no accidental explosion ; the employee of the defendant company intentionally released the appliance which fired the shot, and the explosion occurred at the time he endeavored to bring it about.   The plaintiff offered evidence to the effect that the exercise of ordinary skill and care required that the lower end of the anchor, a slender, tin tube twenty-seven feet long extending down from the torpedo, should have been protected by a cap or plug so as to present a rounded end which would not catch in the joints of the casing, and that the operator should have known how much line was on his reel and have observed the amount of line which had passed from the reel into the well, so as to enable him to determine when the torpedo was somewhere near the bottom, and that the agent of the defendant who did this work had neglected these precautions.   The defendant company having undertaken to do this work was bound to bring to its performance the exercise of the ordinary skill and care of the business, and avail itself of the usual appliances to guard against injury to the property with which it dealt.   The means which it is alleged the agent of the defendant company neglected were intended to prevent the very thing which seems to have occurred in this case, the firing of a shot in the casing, and far above the point where the explosion is intended to occur.   The court below was clearly right in sending this case to the jury ; the question of the negligence of the defendant was submitted under proper instructions, and the specifications of error which relate to that branch of the case are without merit.

The remaining assignments of error relate to the instructions as to the measure of damages, and the admission of evidence in accordance with the views of the court below embodied in such instructions.   The jury were instructed that the plaintiffs could not estimate their damages by the more expensive method, they must take that which was cheapest.   " If the damage could be repaired, then the measure of damages would be the cost of that repair.   But if the cost of the repair would be

more than the value of the property, or if a new well could be drilled more cheaply than this one could be repaired or cleaned out, then of course the party should not estimate his damages by the more expensive method ; he should take that which is cheapest. If it is cheaper to drill a new well he should do that. If it is cheaper to abandon the well altogether then he should abandon it, and then would be entitled to charge the party only with the market price, what it was worth in the market. . . . If it was utterly destroyed, or destroyed so that a repair would cost more than the digging of a new well and the digging of a new well would cost more than it would be worth, then neither of those things should be done, and it would come back to the question of the value of the well. The ordinary value would be the market value at that time." This instruction as to the measure of damages was clear, full and accurate : Hoffman v. Mill Creek Coal Company, 16 Pa. Superior Ct. 631. The instructions of the court as to the elements which the jury were to consider in determining the value of the well were free from error. The value of an oil well necessarily depends upon the amount of oil produced and the expense involved in obtaining it. Ordinary business sense suggests and the testimony in this case clearly established that a small oil well can be more economically operated and is, therefore, more valuable when it can be operated in connection with other wells of the same character. These defendants are presumed to have known the usual and ordinary manner of carrying on the business of which their own occupation was merely a branch. The testimony in this case established that the usual and ordinary method of operating small oil wells was not to employ a separate crew for each well, but to group them and have the same men attend to a number of wells. The defendants had torpedoed other wells for these same plaintiffs, and they knew that this particular well was known as " Stotler Well No. 3," which clearly indicated that there were other wells on the same lease. The value of property is to be determined in view of all the uses to which it may reasonably be devoted, and the various manners in which it may be operated. The defendant was bound to take notice of the injury which would result to plaintiffs' property, as then operated, in consequence of a failure to employ reasonable skill in the performance of their contract: Erie City Iron Works v.

Barber, 102 Pa. 156 ; Pittsburg Coal Company v. Foster, 59 Pa. 365.   The well in question had been operated for a number of years and its production had considerably decreased.   There was no error in the admission of evidence which tended to establish that the usual and ordinary result of shooting wells of that character in that particular field, which had never been shot before, was to increase the production, and that this quality increased the market value of such wells.   There is no absolute certainty of obtaining oil in any given field, but a particular piece of land may be so located that, though unexplored, the right to explore it for oil may be very valuable.   A particular well may never have been shot and there is no absolute certainty that the explosion of a torpedo would increase its production, but the peculiarities of the field in which it is located and the experience of similar operations may be such that the opportunity to increase the production by shooting the well may give to the property an increased value.   The learned judge of the court below carefully guarded against the allowance of any speculative damages, and warned the jury that they must not assume that the production of such a well would be increased by torpedoing; that all that they were to consider was the extent, if any, to which the actual market value of the well was affected by the fact that there was a reasonable prospect of increasing the production by torpedoing.   The argument that the defendants ought only to be held liable for the value of the property as ascertained from its production at the time they made their contract is not well founded.   The defendants certainly had knowledge of the fact that the plaintiffs believed the production of this property would be increased by shooting the well, that was the very object of the contract into which they entered.   They were liable only for the value of the property which they destroyed, but in determining that value the advantages peculiar to the property, and the opportunity to increase its productiveness, if such existed, must be taken into consideration : Adams Express Company v. Egbert, 36 Pa. 360.

The judgment is affirmed.