AMERICAN GLYCERIN CO. et al. v. KENRIDGE OIL CO. et al. (No. 301.)

Court of Civil Appeals of Texas. Eastland. April 29, 1927.

1. Trial ⬮352(5)—Same rules of law govern respecting right to have defenses submitted to jury on general charge as on special issues.

As respects defendant's right to have defensive matter presented to jury by separate charges, same rules of law govern whether the case is submitted on general or special issues.

2. Negligence ⬮63—Question of "unavoidable accident" arises when evidence raises issue that accident happened without fault.

Where the cause of an accident is unknown, and the evidence fairly raises issue that it happened without fault of any one and from a cause different than that claimed by plaintiff, the question of unavoidable accident arises; "unavoidable accident" meaning that it happened unexpectedly and without fault.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unavoidable Accident.]

3. Trial ⬮139(1)—Evidence of premature explosion of nitroglycerin in oil well held to require submission to jury of issue of unavoidable accident.

In action for damages caused by premature explosion of nitroglycerin shell while it was being lowered into oil well, evidence that explosion might have happened from a cause different than that claimed by plaintiffs and from a cause not brought about by defendants' negligence, held to require submission to jury of issue of unavoidable accident.

---

⬮For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Trial ⚎261—Where court failed to submit any charge on issue, special requested charge though incorrect, required court to submit proper charge.**

Where court failed to charge on issue on which special charge was requested, it should have submitted a proper instruction on that issue, since, even though requested charge was incorrect, it was sufficient to call court's attention to the omission.

**5. Damages ⚎208(1)—Where it is uncertain whether destroyed oil well can be reproduced, facts should be submitted to triers of facts for determination.**

In action for damages for destruction of oil well, where it is uncertain whether new well can be reproduced by drilling another one, and value of well exceeds cost of reproducing it, all the facts, conditions, and surroundings throwing light upon the question should be put in evidence, and issue whether well can be reproduced determined by jury or by the court when trial is not before jury.

**6. Damages ⚎111—Damages for destruction of oil well is cost of reproduction, less salvage, but, if reproduction cost exceeds value of well, it is market value of well less salvage.**

If oil well destroyed by premature explosion of nitroglycerin shell can be reproduced by drilling a new well, the measure of damages for its destruction would be cost of reproducing and equipping a new well in same manner destroyed well was equipped, less the value of salvage, but, if the cost of reproduction should exceed value of well, or if well cannot be reproduced, damages recoverable is the reasonable cash market value of the well as equipped immediately preceding its destruction less the value of any salvage.

**7. Pleading ⚎49—Petition alleging that defendants agreed to lower nitroglycerin shell into oil well in careful, slow and proper manner, held to state cause of action in contract.**

In action for damages caused by premature explosion of nitroglycerin shell while being lowered into oil well, petition alleging that defendants agreed to lower nitroglycerin into well in a careful, prudent, slow, and proper manner *held* to state cause of action for breach of express contract and not action in tort, requiring proof as to terms of contract.

**8. Evidence ⚎553(1)—Hypothetical question, whether heat generated by lowering nitroglycerin shell into oil well would explode nitroglycerin, held objectionable.**

In action for damages caused by premature explosion of nitroglycerin shell being lowered into oil well, hypothetical question asked expert witness as to whether amount of heat generated by lowering of shell into casing of well with such rapidity that it would travel 678 feet in the time that it took ordinary man to walk 18 feet, sit down and pick up his dinner pail, would be sufficient to explode the nitroglycerin, *held* objectionable, either as assuming a violation of the laws of gravitation or as affording no standard of comparison.

Appeal from District Court, Stephens County; C. O. Homlin, Judge.

Action by the Kenridge Oil Company and others against the American Glycerin Company and another. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

Kirby, King & Overshiner, of Abilene, for appellants.

Robert E. Bowers, Saunders & Bounds, T. Edgar Johnson, and Chas. H. Clark, all of Breckenridge, for appellees.

HICKMAN, J. The appeal is from a judgment against appellants, American Glycerin Company and Nelson Mosier, the "shooter" employed by it, for damages accrued to the appellees by reason of the premature explosion of a nitroglycerin shell while same was being lowered into an oil well drilled by appellees. The facts show that the well was approximately 3,147 feet deep; that oil was standing about 2,000 feet in the hole, and that it was making 1,000,000 cubic feet of gas per day. Three shells, each containing 30 quarts of nitroglycerin, had been securely landed by the "shooter" in the bottom of the hole where the well was to be shot, and, while lowering the fourth shell, an explosion occurred. The condition of the casing after the accident indicated that this fourth shot was exploded at the depth of about 678 feet.

The particular ground of negligence submitted to the jury, and upon which the judgment was based, was the alleged excessive speed at which the fourth shell was being lowered into the well. The alleged cause of the explosion was heat generated by friction. By the answers of the jury to the several special issues submitted to them, they determined that the defendants lowered the fourth shell of nitroglycerin at a "high rate of speed," that the lowering of the shell at such high rate of speed was negligence on the part of the defendants, which was the proximate cause of the explosion, and that the fair, reasonable cash market value of the well immediately prior to the explosion was $30,000. Upon these findings judgment was rendered against appellants jointly and severally for $30,000.

Many propositions are urged by appellant as grounds for reversal, all of which are vigorously contested by appellees. We have concluded that the case should be remanded for another trial, and it therefore becomes necessary to discuss only such alleged errors as we think might arise upon another trial.

The appellants requested, and the court refused to give, the following special issue:

"Was the premature explosion of the nitroglycerin shell the result of an accident which could not have been prevented by the exercise of ordinary care?"

The contentions are (1) that there was sufficient evidence to warrant the submission of the issue; (2) that the refused charge cor-

⚎For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes.

rectly presented the defense of unavoidable accident; and (3) that, if it was incorrect in all of its particulars, it was sufficient to call the attention of the trial court to such defensive issue, and, since such issue was wholly omitted from the court's charge, it was the duty of the trial court correctly to frame a question presenting the issue to the jury.

[1] The questions must be determined in the light of the decisions that, with regard to the right of a defendant to have his defensive matter presented to the jury by separate charges, the same rules of law govern, whether the case is submitted upon general charge or special issues. Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; Colorado & Southern Ry. Co. v. Rowe (Tex. Com. App.) 238 S. W. 908.

The question of unavoidable accident was clearly raised both by the pleadings and the evidence in this case. The theory of appellees upon which the judgment is based is that, by lowering the shell containing the nitroglycerin at a high rate of speed through a casing with only approximately a one-inch difference between the diameter of the inside of the casing and that of the shell, the friction of the shell coming in contact with the casing on its descent generated sufficient heat to cause the explosion. The expert placed on the stand by them testified on cross-examination, in substance, that nitroglycerin is a very unstable compound; that any cause which will bring about disintegration of the compound will cause an explosion; that it might be caused by an electric shock, by striking it with a hard substance, shock, heat, pressure, "hatching." He stated that frequently it is very hard to determine what brings about an explosion; that they frequently occur to which no one can assign an immediate cause. Often it is due to not washing it properly, by which is meant getting all of the acid out of it. He further testified that there are frequent explosions, the causes of which rest in pure conjecture. In explanation of the word "hatching," this witness testified that he had heard that, in the territory in which this well was located, it sometimes happens that shells filled with nitroglycerin, when placed in a well at a depth in excess of 3,000 feet, where oil is standing in the well, are allowed to remain there for any length of time, will explode or hatch without the application of any outside force. Some character of chemical reaction takes place in that particular territory when nitroglycerin is submerged in oil at a depth in excess of 3,000 feet, which generates a heat causing spontaneous combustion or hatching. This does not occur in a dry hole.

[2, 3] No one knows what caused the explosion of the shell in this case. The idea is not at all excluded that the shells which had been placed in the bottom of the hole "hatch-ed," and that the disturbance caused thereby exploded this shell by concussion. Other theories of how it might have occurred are plausible. Where the cause of an accident is unknown and the evidence fairly raises the issue that it happened without the fault of any one, and from a cause different to that claimed by plaintiff, a question of unavoidable accident arises. The essential meaning conveyed by the term "unavoidable accident" is that it happened unexpectedly and without fault. The evidence shows that the explosion might have happened from a cause entirely different to that claimed by plaintiff, and from a cause not brought about by the negligence of the defendant. It was therefore error on the part of the trial court not to submit to the jury an issue on the question of unavoidable accident. G., H. & S. A. Ry. Co. v. Washington et al., 94 Tex. 510, 63 S. W. 534; Colorado & Southern Ry. Co. v. Rowe (Tex. Com. App.) 238 S. W. 908.

Appellees rely upon the cases of Wichita Falls Traction Co. v. Craig (Tex. Civ. App.) 250 S. W. 733, and Boyles v. McClure et al. (Tex. Com. App.) 243 S. W. 1080, in support of their contention that the question of unavoidable accident is covered by the charge of the court, and the determination by the jury that the proximate cause of the explosion was the high rate of speed with which appellants negligently lowered the shell. An examination of these authorities discloses that in each of them there was no question as to how the accident occurred. In one, the accident was caused by collision between a street car and an automobile, and in the other it was caused by a truck backing into a team of horses. The opinion in the former case very clearly expresses the distinction between these cases and the Washington and Rowe Cases, supra; one essential difference between the cases being that the cause of the accident was known in one and unknown in the other. If we could know that in this case friction caused the explosion, there would arise no issue of unavoidable accident.

[4] Appellees insist that the special issue requested was not a proper issue, because it incorporated two separate and distinct questions which might have been answered differently, and because it submitted to the jury a mixed question of law and fact. We believe the charge is substantially correct. There is no question but that the explosion was the result of an accident. An accident, as the term is used in this charge, means merely that the happening was unexpected. The issue submitted a question of whether or not the explosion was the result of a certain kind of accident. However, we do not feel called upon to determine whether or not this requested issue was correctly worded. The learned trial judge can correctly frame a charge submitting appellant's defenses to

a jury upon another trial of the case. In our view, it is immaterial to the decision of this case whether or not the requested charge was legally correct in all particulars. It was sufficient to direct the attention of the trial judge to the particular defensive matters relied upon by appellants; and, since the court had wholly failed to submit the issue to the jury in his main charge, the requested charge called his attention to such omission, and it thereby became his duty to prepare and submit to the jury a correct charge embodying the issue suggested. This rule is well established by an unbroken line of decisions in our state. Authorities almost without number could be cited in support thereof, but the following will suffice: G. C. & S. F. Ry. Co. v. Cusenberry, 86 Tex. 525, 26 S. W. 43; Neville v. Mitchell, 28 Tex. Civ. App. 89, 66 S. W. 579; G. C. & S. F. Ry. Co. v. Mangham, 29 Tex. Civ. App. 486, 69 S. W. 80; Olds Motor Works v. Churchhill (Tex. Civ. App.) 175 S. W. 786; Brady v. McCuistion (Tex. Civ. App.) 210 S. W. 816; Roberts v. Houston Motor Car Co. (Tex. Civ. App.) 188 S. W. 257; Texas Refining Co. v. Alexander (Tex. Civ. App.) 202 S. W. 131.

Appellees rely upon such cases as Wells Fargo & Co. v. Benjamin, 107 Tex. 331, 179 S. W. 513, and Railway Co. v. Mangham, 29 Tex. Civ. App. 486, 69 S. W. 80. They cite other cases, but these illustrate the character of decision. Those decisions are based upon the well-established rule that, where the court has made a correct general presentation of the issue, if the party desires a fuller charge on that issue, he must request a correct one, and, if the requested charge is erroneous, the court should refuse it, and it does not constitute error to do so. That rule has no application to this case, because the court wholly failed to give any general charge upon the issue.

The case of Railway Co. v. Mangham, supra, relied upon by appellees, clearly states the rule in this language:

"It is well settled that, where the court fails to charge on an issue and a special charge is requested, though incorrect, but sufficient to call the court's attention to the omission, the court should submit a proper instruction on that issue."

That is exactly the question presented in this case.

Appellants' assignment, complaining of the failure of the court to submit an issue of unavoidable accident, is therefore sustained.

[5] The measure of damages adopted by the trial court was the fair, reasonable, cash market value of the well immediately prior to the explosion. Appellants insist that this is an incorrect measure, citing the case of Donnan v. Pennsylvania Torpedo Co., 26 Pa. Super. Ct. 324.

That case announces this rule:

"If the damage could be repaired, then the measure of damages would be the cost of that repair. But if the cost of the repair would be more than the value of the property, or if a new well could be drilled more cheaply than this one could be repaired or cleaned out, then of course the party should not estimate his damages by the more expensive method; he should take that which is cheapest. If it is cheaper to drill a new well he should do that. If it is cheaper to abandon the well altogether then he should abandon it, and then would be entitled to charge the party only with the market price, what it was worth in the market. * * * If it was utterly destroyed, or destroyed so that a repair would cost more than the digging of a new well and the digging of a new well would cost more than it would be worth, then neither of those things should be done, and it would come back to the question of the value of the well. The ordinary value would be the market value at that time."

Since actual damages are compensatory and not punitive, this rule is manifestly just where the cost of reproduction would exceed the value of the well, for the real damages suffered by the plaintiff would be the value of the property destroyed, regardless of how much it may have cost him. The difficulty arises in its application to a case where the value of the well exceeds the cost of reproducing it. This difficulty arises by reason of the fact that there is no way to definitely determine that the well could be reproduced by drilling another one. In that case all of the facts, conditions, and surroundings throwing light upon the question should be put in evidence and the issue as to whether or not the well could be reproduced determined by the jury, or by the court when trial is not before a jury. There was some evidence in this record that salt water filled this well after the explosion, and that salt water would permeate a producing oil sand, driving the oil before it. That is one of the facts properly to be considered by the jury in determining whether or not the well could have been reproduced. Other facts may be available upon another trial.

[6] We suggest that upon another trial of this case evidence should be admitted and the jury called upon to determine in answer to a proper special issue whether or not the well could have been reproduced by drilling another one. If so, the correct measure of damages would be the cost of reproducing and equipping same in the manner that this well was equipped, less the value of any salvage realized by appellees, provided the cost would not exceed the value of the well. Should the cost of reproduction as found by the jury exceed the value of the well, as found by them, or should the jury determine upon competent testimony that the well could not have been reproduced, the damages should be assessed at the reasonable, cash market value of the well as equipped immediately pre-

ceding its destruction, less the value of any salvage realized by appellees.

[7] A very serious question has been presented on this appeal by the manner in which appellees pleaded their case in the petition upon which they went to trial. We have carefully considered thier petition, and have concluded that they base their cause of action upon a breach of an express contract rather than upon a tort. The substance of their allegation with reference to the contractual relations entered into between them and the appellants was that the appellants agreed, bound, and obligated themselves to lower the nitroglycerin into the well in a careful, prudent, slow, and proper manner. They failed to prove any agreement regarding how the nitroglycerin should be lowered in the well, but proved only that they employed appellants to shoot the well with 120 quarts of nitroglycerin. Such contract necessarily imposed upon appellants the duty and obligation to use ordinary care in lowering the nitroglycerin into the well in a prudent and proper manner, with due regard to its high explosive nature and the great damage which might be sustained by an explosion. It was not necessary to plead that they expressly agreed to lower the shell slowly, but, having pleaded such express agreement, we have concluded that they rested their case upon a breach of the contract in that regard rather than upon tortious negligence growing out of a duty impliedly imposed by contract. Upon another trial, appellees should either recast their pleading in this regard or else offer testimony in proof of all the terms of their alleged contract.

[8] Appellants challenge the sufficiency of the evidence in this record to support the judgment, and, in view of another trial of this cause, we feel that the court should have the benefit of our views in regard to this evidence. The only real basis for a conclusion that friction raised the temperature of this nitroglycerin to the explosion point is contained in an answer of H. L. Jones, a witness for the appellees, who qualified as a chemist. The witness had propounded to him a hypothetical question, the substance of which was as follows:

Assuming that a nitroglycerin shell 12 feet long, filled with 30 quarts of nitroglycerin, weighing about 100 pounds, was lowered in casing, the inside diameter of which was 4⅞ inches, and rubbed the casing as it went down, and that such shell of nitroglycerin was lowered with such rapidity as that it would travel 678 feet in the same length of time that it would take an ordinary man to walk about 18 feet, sit down and take up his dinner pail, would such descent at that rapidity be sufficient to create sufficient heat to explode the nitroglycerin? To which the witness answered that, in his judgment, it would.

This hypothetical question was based upon the testimony of the driller and the tool dresser, who were present at the time the well was shot, each testifying that the shell was lowered fast, and one of them testifying that he walked to his dinner pail 15 or 18 feet away and sat down to eat his dinner between the time the fourth shell was started in the hole and the explosion. The value of expert testimony on a matter of this character must be measured in terms of the facts upon which it is based. This witness was testifying as to how much heat would be generated by friction, and the answer to the interrogatory necessarily depended upon some knowledge of the speed at which the shell was being lowered. The interrogatory did not advise him on that question. There is no intimation of the number of seconds, and no other standard of comparison, except the length of time it would require an ordinary man to walk about 18 feet, sit down and pick up his dinner pail. The time suggested affords a very unsatisfactory standard by which to measure the speed of the shell. We do not know the period of time which was suggested to the mind of the witness, but to us the period suggested does not exceed four seconds. Even if the shell had been detached from the line and wheel and dropped in space with no friction to retard its fall and no flow of gas moving counter to its course, it would not have fallen one-half the distance stated in that period of time. The interrogatory either assumed a violation of the invariable laws of gravitation, or else was subject to the objection made that it afforded no standard of comparison. The objection should have been sustained by the court.

Other interesting questions are presented, but enough has been written to indicate the views entertained by this court as to the controlling issues presented by the record.

Believing that errors of law prejudicial to the rights of the appellants were committed in the trial of this cause, the judgment against them will be reversed, and the cause remanded.